UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STATION ENTERPRISES, INC., d/b/a
TREE TOWN TOYS AND BRAIN STATION,

       Plaintiff,

vs.                                        Case No. 07-CV-14294

                                           HON. GEORGE CARAM STEEH

GANZ, INC., *et al.*,

       Defendant.
_____/

ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT (#71)

     Plaintiff Tree Town Toys ("Tree Town") brings the present lawsuit against Ganz, Inc., and Ganz U.S.A. LLC (collectively "Ganz") alleging breach of contract and breach of warranty in violation of Article 2 of the Michigan Uniform Commercial Code, a common law claim of misrepresentation, as well as violation of the Sherman Act, 15 U.S.C.A §1. Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56(c), alleging there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

## STATEMENT OF FACTS

     This is a case stemming from a contractual dispute between two commercial parties regarding the delivery of goods, specifically "Webkinz" toys. Webkinz are small

stuffed animals, each of which is packaged with a unique user code that grants access to a product-linked website, "Webkinz World."

Tree Town owns a retail toy store and also sells toys online. Ganz markets and distributes toys, including Webkinz, in the U.S.A. and worldwide. Tree Town began ordering Webkinz and other merchandise from Ganz in August, 2006. The parties conducted business without complaint until January 2007, when the series of events in question began.

Tree Town and Ganz agree that demand for Webkinz products increased sharply in early 2007, and Ganz acknowledges struggling to fulfill orders for established and new customers during this period. On January, 19, 2007, Tree Town attempted to place a large order for the toys through Ganz' sales representative Kelly Fisher. Fisher told Tree Town owners Hans and Patricia Masing that she was unable to place the order, but that the products could be purchased at the Chicago Gift Show, which began the following day. The Masings traveled to Chicago later that day.

Both parties agree that at the Chicago show, Tree Town was assured access to special financing terms and unlimited purchases of otherwise quantity-controlled limited-edition products in return for meeting certain minimum purchase requirements. Plaintiff also contends it was promised "high priority delivery status" for all future orders.

Plaintiff claims that the promises of financing, access to limited-edition products and "high priority delivery status" constituted an offer to form a contract, which plaintiff accepted by placing orders for several thousand Webkinz units and additional non-Webkinz merchandise at the gift show, prepaying $7,704 on two separate credit cards and writing a check for $22,136 on January 20.

Plaintiff claims its January 20 orders were subsequently either not fulfilled or were only partially fulfilled. Plaintiff also claims that various additional orders placed after Jan. 20, 2007 were either not fulfilled or were only partially fulfilled.

Defendants acknowledge that "the demand for Webkinz rose exponentially beginning in January 2007" and that as a result of this "surprise boost in popularity" "shipment of Webkinz against orders fell behind for several months before supplies caught up with demand." While acknowledging this problem, defendants also claim part of the delay stems from their decision to put the plaintiff's outstanding orders on hold in April, 2007, to investigate what Ganz viewed as unusual ordering habits. Plaintiff responds that depositions have shown no evidence of such an investigation.

Plaintiff claims it was told during this period that it needed to purchase more non-Webkinz product ("Core Product") to ensure shipping of its Webkinz orders. Plaintiff claims it ultimately ordered $15,000 in Core Product in an effort to have Ganz determine whether the original Webkinz orders would be shipped.

On May 24, 2007, plaintiff notified Ganz that it was cancelling all outstanding orders for Core Product, but did not cancel its outstanding orders for Webkinz. Ganz accepted plaintiff's cancellation via e-mail on July 11, and wrote that it would, "ship your client's orders for Webkinz merchandise as stock becomes available."

On August 24, plaintiff notified Ganz that it was cancelling all outstanding orders for Webkinz due to Ganz' failure to deliver in a reasonable time. The records provided by the parties are unclear on whether any shipments of Webkinz were shipped between defendants' July 11 promise to ship the pending Webkinz orders and plaintiff's August 24 cancellation.

Plaintiff filed its complaint on October 10, 2007 asserting causes of action for breach of contract, breach of warranty, misrepresentation and violations of the Sherman Act against Ganz. Defendants filed a motion for summary judgment under Fed. R. Civ. P. 56 on March 31, 2009.

## STANDARDS FOR DISMISSAL UNDER RULE 56

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court must construe all reasonable inferences in favor of the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 575 (1986). The issue to be decided is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). The nonmoving party cannot rest on its pleadings to avoid summary judgment, but must support its claim with probative evidence. Anderson, 477 U.S. at 248; Kraft v. U.S., 991 F.2d 292, 296 (6th Cir. 1993), cert. denied, 510 U.S. 976 (1993). If the evidence is

merely colorable or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249-50.

**ANALYSIS**

I. Breach of Contract

Plaintiff contends that an oral contract covering all subsequent Webkinz orders was formed at the Chicago Gift show when it accepted the Ganz' representative's offer of "high priority delivery status", access to special financing terms and unlimited purchases of otherwise quantity-controlled limited-edition products by (a) placing orders that met certain minimum purchase requirements and, (b) tendering payment for those orders.

Defendants' motion for summary judgment argues in opposition that the oral contract fails to meet that statute of frauds or, alternatively, that a lack of acceptance prevented plaintiff's orders from becoming binding contracts between the parties.

A. Statute of Frauds

Under the Uniform Commercial Code as adopted in Michigan, a contract for the sale of goods for the price of $1,000 or more is not enforceable unless there exists a writing sufficient to indicate that the contract has been made between the parties and is signed by the party against whom enforcement is sought. M.C.L.A. § 440.2201(1). In dealings between merchants, a writing in confirmation of a contract sufficient against the sender satisfies the requirements of a written contract if it is received within a reasonable time and no written notice of objection to its contents is given within 10 days after it is received. M.C.L.A. § 440.2201(2). Receipt and acceptance of payment "constitutes an unambiguous overt admission by both parties that a contract actually

5

exists." Official comment 2, M.C.L.A. § 440.2201.  In addition, terms upon which confirmatory memoranda of the parties agree, or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms may be explained or supplemented by course of dealing or usage of trade or by the course of performance. M.C.L.A. § 440.2202.

The statute of frauds is intended "to afford a basis for believing that offered oral evidence rests on a real transaction." Matter of Estate of Frost, 130 Mich.App. 556, 559 (1983). When a writing sufficient to satisfy the statute is produced, the statute of frauds is satisfied and the only question remaining is to determine whether parol evidence may be admitted in order to make the agreement sufficiently definite to be enforceable.  Id.

Here, there is a course of dealing between the parties that includes multiple orders, acknowledgements, payments tendered and accepted, and goods shipped and accepted. These orders and acknowledgements include the subject matter Webkinz, prices, quantities and delivery dates.

For example, Ganz acknowledges that order AP64960 was placed by plaintiff at the Chicago Gift Show on January 20, 2007, payment was tendered in the form of a check and accepted by Ganz, and the full order of 4,020 Webkinz toys was shipped to plaintiff by February 26, 2007.  In addition, order AP64940 was also placed on January 20, 2007. Ganz acknowledges receiving the order, accepting payment via a combination of credit card payments and checks, and partially shipping the goods. For order AP64940, 1,200 Webkinz Koalas were shipped, but 1,200 Lil' Kinz Tree Frogs were not.

Finally, in one last example, Ganz acknowledges that plaintiff placed order BC11440 on March 8, 2007, that plaintiff paid for the order via credit card, and that the order was partially filled on or about May 10, 2007, when 84 of 1,416 items ordered were subsequently shipped.

The court finds that the combination of orders, acknowledgement, terms and conditions, and performance between the parties suffices to satisfy the statute.

B. Acceptance by partial performance and payment

Under the Uniform Commercial Code (U.C.C.) as adopted by Michigan, an offer to make a contract may be construed as "inviting acceptance in any manner and by any medium reasonable in the circumstances."  M.C.L.A. § 440.2206(1)(a).  Under the U.C.C. either "shipment or the prompt promise to ship is made a proper means of acceptance of an offer." U.C.C. official comment to M.C.L.A. § 440.2206.

In addition, receipt and acceptance of payment "constitutes an unambiguous overt admission by both parties that a contract actually exists."  Official comment 2, M.C.L.A. § 440.2201.

Here, as noted in the previous section, there is evidence of performance, partial performance and payment sufficient to raise a question of fact as to whether a contract was offered and accepted at the Chicago gift show.  Both parties acknowledge that payment was made and accepted for orders placed at the show.  Some of those orders were shipped in their entirety, some of them were partially shipped, and some had projected shipping dates after the plaintiff's subsequent cancellation of all Webkinz orders.

7

Given the conduct between the parties on and after the Chicago Gift Show, the court finds there is a genuine question of material fact concerning whether an oral contract was formed concerning orders placed on Jan. 20, 2008.

More problematic, however, is the question of whether any contract formed at the Chicago Gift Show would cover subsequent orders placed by the plaintiff. The complaint attempts to extend any contract formed at the show to all subsequent orders by claiming that the plaintiff was promised ongoing "high priority delivery status," but plaintiff offers limited probative evidence of such a promise. Furthermore, the plaintiff does little to demonstrate what either side understood any potential promise of "high priority delivery status" to include, and whether or how such a promise was not met.

However, in construing all reasonable inferences in favor of the non-moving party, the court finds an issue of fact exists regarding the meaning of "high priority delivery status," whether it was a contract term, and, if so, whether it was breached.

### C. Anticipatory breach

Plaintiff includes in its breach of contract complaint three Webkinz orders with shipping dates after plaintiff's August 24, 2007 cancellation notice to Ganz of all pending Webkinz orders. The three orders in question were scheduled to ship between October 1, 2007 and Jan. 10, 2008.

To bring action for anticipatory breach of contract, the plaintiff must show that the defendant unequivocally declared the intent not to perform. Bob Turner, Inc. v. Leahy, 2000 WL 33406998 (Mich. Ct. App. 2000); Washburn v. Michailoff, 240 Mich.App. 669, 674-75 (2000). One example of anticipatory breach would entail a party to the agreement informing the other party that it is "absolutely impossible" to perform the

contract. Buys v. Travis, 243 Mich. 470, 475 (1928). A statement cannot be considered a renunciation unless it is a distinct, unequivocal, and absolute refusal to perform. Frohlich v. Independent Glass Co.,144 Mich. 278, 280-81 (1906).

Here, plaintiff has offered no evidence that Ganz unequivocally declared an intent not to perform in regard to the latter orders. In a letter dated June 4, Ganz acknowledges the previous supply problems, but claims that its supply problem has eased and it is now able to "resume substantial shipments to its customers." Defendants' motion for summary judgment as to plaintiff's claims in regard to any Webkinz orders with shipping dates beyond plaintiff's August 24 notice of cancellation is GRANTED.

### D. In summary

Defendants' motion for summary judgment in regard to plaintiff's claim of breach of contract regarding all Webkinz orders scheduled to ship prior to plaintiff's August 24, 2007 cancellation is DENIED for reasons stated above. Defendants' request for summary judgment in regard to breach of contract claims regarding all Webkinz orders scheduled to ship after plaintiff's August 24 cancellation is GRANTED for reasons stated above.

## II. Breach of Warranty

In Count II, plaintiff originally brought a breach of warranty claim, but has stipulated that it be dismissed. Defendants' request for summary judgment in regard to plaintiff's breach of warranty claim is GRANTED as stipulated to by the parties.

III. Misrepresentation

In Count III of the complaint, plaintiff's claim of misrepresentation alleges that it was induced into placing orders at the Chicago Gift Show when Ganz falsely and in bad faith represented that prepayment of orders made at the gift show would result in high priority delivery status. In its response to defendants' motion, plaintiff appears to attempt to amend its misrepresentation claim to a claim of fraud in the inducement.

Under the Economic Loss Doctrine as adopted by Michigan, economic losses related to commercial transactions are generally not recoverable in tort. Quest Diagnostics, Inc. v. MCI Worldcom, Inc., 254 Mich. App. 372, 376 (1992). A claim for misrepresentation is a claim in tort. A&A Asphalt Paving v. Pontiac Speedway, 363 Mich. 634 (1961).

Plaintiff argues in its response that fraud in the inducement is an exception to the Economic Loss Doctrine. "Courts generally have distinguished fraud in the inducement as the only kind of fraud claim not barred by the economic loss doctrine." Huron Tool & Engineering Co. v. Precision Consulting Services, 209 Mich.App. 365, 371 (1995). "Fraud in the inducement … addresses a situation where the claim is that one party was tricked into contracting. It is based on pre-contractual conduct which is, under the law, a recognized tort." Id. (quoting Williams Electric Co., Inc. v. Honeywell, Inc., 77 F.Supp 1225, 1237-38 (N.D. Fla., 1991)).

Whether the claim is misrepresentation or fraud in the inducement, there is insufficient evidence to support the allegation that Ganz never intended to provide priority shipping. Plaintiff has not even defined the term (priority shipping) sufficiently, and any alleged "promise" has not been shown to be definitive enough to be entitled to

reliance by plaintiff.  An amended complaint stating the proposed claim has not been submitted for review; nor has plaintiff outlined specific facts supporting this putative claim.  Given the extended discovery period related to this case, and the fact that discovery is closed, the court will not allow further amendments.

Defendants' motion for summary judgment as to plaintiff's claim of misrepresentation is GRANTED and permission is DENIED to plaintiff to amend its complaint to include claims of fraud in the inducement made in regard to priority shipping of orders placed at the Chicago show.

IV. Unlawful Tying - Sherman Act § 1

In Count IV, plaintiff alleges violation of the Sherman Act arising from defendants' conditioning the sale and delivery of Webkinz to the purchase of non-Webkinz merchandise.  The Sherman Act does not explicitly prohibit tying arrangements, however such arrangements can violate Section 1 of the Sherman Act when they produce an anticompetitive effect.  Requiring that a customer purchase unwanted products is not illegal; rather, it is the reduction of competition in the market for those unwanted "tied" products that forms the violation of the Sherman Act.

A tying arrangement is defined "as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."  Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6 (1958); Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 461-62 (1992).  Tying arrangements have been found to be "unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free

11

competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." Northern Pac. Ry., 356 U.S. at 6. A tying claim under the Sherman Act requires that the plaintiff prove that a seller had substantial economic power in the tying product's market, and an anticompetitive effect in the tied-product market. Highland Capital, Inc. v. Franklin National Bank, 350 F.3d 558, 565 (6th Cir. 2003) (citations omitted), Eastman Kodak, 504 U.S. at 462 (arrangement constitutes impermissible tie under § 1 of Sherman Act "if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.").

There are two theories of tying - *per se* and rule-of-reason. Under rule-of-reason analysis, the antitrust plaintiff must show an adverse effect on competition. The Sixth Circuit has adopted the following three-step analysis for determining whether a tying arrangement is likely to cause such an anticompetitive effect: "(1) the seller must have power in the tying product market; (2) there must be a substantial threat that the tying seller will acquire market power in the tied-product market; and (3) there must be a coherent economic basis for treating the tying and tied products as distinct." Hand v. Central Transp., Inc., 779 F.2d 8, 11 (6th Cir. 1985). Under traditional per se analysis, restraints of trade were condemned without any inquiry into the market power possessed by the defendant. However, under current per se analysis, the antitrust plaintiff must show the seller possesses substantial market power in the tying product market and that the arrangement affects a substantial volume of commerce in the tied market. Kodak, 504 U.S. at 462, 478-79. The two theories differ in only one respect - the per se analysis dispenses with proof of anticompetitive effects. PSI Repair

Services, Inc. v. Honeywell, Inc., 104 F.3d 811, 815 n.2 (6th Cir. 1997) (citing 10 Phillip E. Areeda et al., Antitrust Law ¶ 1760e, at 372 (1996)).

### A. Relevant Product Market (Tying Market)

Plaintiff defines the relevant tying market in this case as the market for toys combined with online internet gaming in the United States. Plaintiff has not produced any expert witness testimony regarding the relevant product market. A product market is defined in terms of interchangeability of use or cross-elasticity of demand. Brown Shoe v. United States, 370 U.S. 294, 325 (1962). Defendants question why the market should exclude toys that do not have an online gaming component, or online gaming sites that are not combined with toys. There is no evidence in this case that other toys or web sites are not reasonably interchangeable with Webkinz, or that there is insufficient cross-elasticity of demand between such products and Webkinz.

### B. Market Power in Relevant Product Market

Discovery in this case shows that defendants' sales of Webkinz in the United States from August 2006 to September 2007 were over $256 million. Plaintiff compares this figure to sales of Shining Stars, another toy that provides online gaming. Russ Berrie & Company, the manufacturer of Shining Stars, announced sales of $4 million in the second quarter of 2007.

Defendants' attack plaintiff's "proof" of market power in the relevant product market. First, plaintiff presented no evidence that Shining Stars is Webkinz' closest competitor. Second, comparing the top two competitors in a market, without more, does not prove anything about either firm's market power. For example, if 50 other competitors had yearly sales of $5 million each, then Webkinz' $256 million in 2006 to

13

2007 would be only half of the relevant market. This is a different picture than plaintiff tries to present when it only compares figures to one competitor.

Plaintiff next argues that there are barriers to entry in the relevant product market, specifically, "network effects." A network effect refers to a situation where the value of a good or service depends on the number of existing users. As the popularity of the product increases, the purchase of the good by another consumer indirectly benefits those who already own the product. Webkinz has a social networking feature that allows a purchaser of a Webkinz to invite other Webkinz users to play an online game. Potential competitors face the problem of attracting customers when there are few others online. Plaintiff offers no evidence to support its "network effects" argument.

### C.  Tied Product Market

The basis for condemning tying arrangements as a violation of the Sherman Act lies in their impact on competition in the *tied* product market. Illinois Tools Works v. Indep. Ink, Inc., 547 U.S. 28, 34 (2006). Plaintiff alleges that defendants conditioned the shipment of Webkinz to the purchase of Core Product. Core Product allegedly consists of three tied product markets: Souvenirs & Novelties, the Home Decorative Accessories Market, and the Seasonal Decorations Market. According to plaintiff, all three tied product markets are recognized as submarkets of the giftware industry. Plaintiff defines the Souvenirs & Novelties market as the United States market for the sale of items to souvenir and novelty shops that are designed to be bought and given as gifts for personal reasons or special events such as Mother's Day or graduation. The Home Decorative Accessories market is the United States market for products designed and manufactured to be bought to decorate the interior of a home. The Seasonal

Decorations market is defined as the United States market for products designed and manufactured for the Holidays, such as Halloween, Thanksgiving, Christmas and Easter.

### D.  Injury to or Impact on Competition

Plaintiff alleges that defendants had a policy requiring plaintiff and other retailers, on a nationwide basis, to purchase unspecified quantities of Core Product in order to receive shipments of Webkinz.  According to plaintiff, Ganz was motivated by a desire to restrict competition in the relevant tying and tied product markets.  Plaintiff suggests that at trial it will be able to prove it suffered damages from having to purchase the tied products, that took up valuable inventory space that could have been used for products that compete against the tied products.

Plaintiff's argument misses the point of the Sherman Act's protection of competition in the tied market.  Plaintiff offers no evidence that the defendants' conduct resulted in an increase in price or a decrease in output of any tied product, or the elimination of any competing manufacturer of those products.

### E.  Conclusion

Defendants' motion for summary judgment as to plaintiff's Sherman Act claim is GRANTED.  Plaintiff has failed to provide any evidence supporting its allegation of a negative impact on competition in the tied produce market.

## CONCLUSION

For the reasons stated in this opinion, defendants' motion for summary judgment is DENIED in relation to plaintiff's claim of breach of contract regarding all Webkinz orders scheduled to ship prior to plaintiff's August 24, 2007 cancellation. In addition,

defendants' motion for summary judgment as to plaintiff's claim of misrepresentation is GRANTED and permission is DENIED to plaintiff to amend its complaint to include claims of fraud in the inducement.

Defendants' request for summary judgment in regard to plaintiff's claims for violation of the Sherman Act, breach of warranty and all breach of contract claims regarding Webkinz orders scheduled to ship after plaintiff's August 24 cancellation is GRANTED.


Dated: September 10, 2009

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on September 10, 2009, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk

---